UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                :
  JOHN K. LEFTRIDGE,                            :
                                                :        17cv7027
                        Plaintiff,              :
                                                :        OPINION & ORDER
             -against-                          :
                                                :
  NEW YORK CITY DEPARTMENT OF                   :
  EDUCATION, *et al.*,                          :
                                                :
                        Defendants.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                :

WILLIAM H. PAULEY III, Senior United States District Judge:

        Pro se Plaintiff John K. Leftridge, a former New York City schoolteacher, brings

this employment discrimination action against the New York City Department of Education (the

"DOE"), Sandra Philip, and Janiece Bailey (together, "Defendants") claiming violations under

Title VII of the Civil Rights Act of 1964 ("Title VII"), the Rehabilitation Act of 1973

("Rehabilitation Act"), the Americans with Disabilities Act of 1990 ("ADA"), the Family and

Medical Leave Act of 1993 ("FMLA"), the New York State Human Rights Law ("NYSHRL"),

and the New York City Human Rights Law ("NYCHRL").  Leftridge claims, inter alia, that

Defendants unlawfully terminated his employment on the basis of gender and disability,

retaliated against him for his discrimination complaints, and failed to provide accommodations

and medical leave benefits.  Defendants move for summary judgment dismissing all claims.  For

the reasons that follow, Defendants' motion is granted and this action is dismissed.

BACKGROUND

I.      Employment with the DOE

        In 2002, the DOE employed Leftridge as a schoolteacher at P.S. 146 in

Manhattan.  (Pl.'s Resp. to Defs.' Local Rule 56.1 Statement of Undisputed Material Facts, ECF No. 85 ("Pl.'s 56.1"), ¶ 2.)  Leftridge was certified to teach pre-kindergarten through sixth-grade.  (Pl.'s 56.1 ¶ 3.)  In 2003, Leftridge transferred to P.S. 93 in Brooklyn where he began teaching physical education.  (Pl.'s 56.1 ¶¶ 4–5.)  He continued as a physical education teacher until 2013.  (Pl.'s 56.1 ¶ 5.)

In 2009, Sandra Philip became principal of P.S. 93, and in 2010, Janiece Bailey was named assistant principal.  (Pl.'s 56.1 ¶¶ 7, 9.)  At the end of the school year in 2013, Philip assigned Leftridge to teach a third-grade class the following year.  (Pl.'s 56.1 ¶ 11.)  In November 2013, following an incident in which one of Leftridge's students left the building during the school day, the DOE reassigned Leftridge to a non-teaching position at P.S. 3 in Brooklyn.  (Pl.'s 56.1 ¶ 12.)  In March 2014, the DOE served disciplinary charges pursuant to New York Education Law Section 3020-a ("§ 3020-a") on Leftridge stemming from the November 2013 incident.  (Pl.'s 56.1 ¶¶ 13–14.)  Following a hearing, Leftridge was found not guilty and the charges were dismissed in August 2014.  (Pl.'s 56.1 ¶ 15.)

II.    2014-15 Classroom Observations and "Leftridge I" Lawsuit

The DOE assigned Leftridge to teach a fifth-grade class at P.S. 93 for the 2014-15 school year.  (Pl.'s 56.1 ¶¶ 16–18.)  During that school year, teachers were evaluated using the "Advance Guide for Educators" framework.  (Pl.'s 56.1 ¶ 26; Decl. of Alana R. Mildner in Supp. of Defs.' Mot. for Summ. J., ECF No. 75 ("Mildner Decl."), Ex. F.)  As part of the Annual Professional Performance Review ("APPR"), teachers were given a Measures of Teacher Practice ("MOTP") score generated by administrators following classroom observations.  (Pl.'s 56.1 ¶ 27.)

Leftridge was evaluated six times during the 2014-15 school year and each

observation and post-observation conference followed a similar pattern. For example, Philip observed Leftridge's classroom on October 31, 2014 and noted, among other things, that he "did not correct errors made by students," that his lesson lacked a "clearly defined structure," and that his "[f]eedback was of poor quality." (Pl.'s 56.1 ¶ 28; Mildner Decl., Ex. G, at D000395–97.) During the post-observation conference on November 3, 2014, Philip provided Leftridge with written recommendations for improvement. (Pl.'s 56.1 ¶ 28.) Subsequently, Philip observed Leftridge's classroom and made evaluations on March 12 and April 23, 2015.[1] (Pl.'s 56.1 ¶¶ 30, 34.) Bailey conducted observations and evaluations of Leftridge on January 9, March 31, and June 22, 2015. (Pl.'s 56.1 ¶¶ 29, 31, 37.) Leftridge argues that all of these evaluations were unfair because he was assigned a class with difficult students and spent a significant amount of time dealing with behavioral issues. (Pl.'s 56.1 ¶¶ 28–31, 34, 37.) Leftridge received an "Ineffective" APPR rating for the 2014-15 school year. (Pl.'s 56.1 ¶ 39.)

On April 24, 2015, following his receipt of a right to sue letter from the U.S. Equal Employment Opportunity Commission ("EEOC"), Leftridge filed a civil action against Defendants DOE and Philip pursuant to Title VII. (Pl.'s 56.1 ¶ 23; John Leftridge v. N.Y.C. Dep't. of Educ., 15-cv-03460 ("Leftridge I"), ECF No. 2).) In July 2015, he amended his complaint to include claims of race, gender, and disability discrimination, as well as failure to accommodate and retaliation claims, under Title VII and the NYCHRL. (Mildner Decl., Ex. D.)

III.    2015-16 Classroom Observations, Injury, and Disability Benefits

While his lawsuit was pending, Philip assigned Leftridge to teach a third-grade

---

[1]    On April 20, 2015, Leftridge was standing in the doorway of his classroom when a student's shoulder made contact with Leftridge's stomach, causing him to fall on his back. (Pl.'s 56.1 ¶ 32.) Leftridge began feeling back pain and was on leave from the DOE from April 27, 2015 until June 22, 2015. (Pl.'s 56.1 ¶¶ 35–36.)

class for the 2015-16 school year.[2]  (Pl.'s 56.1 ¶ 41.)  On October 7, 2015, Bailey observed Leftridge and noted that his students were not intellectually engaged in the lesson.  (Pl.'s 56.1 ¶ 43.)  Bailey provided a lesson planning template to Leftridge and gave him additional advice. (Pl.'s 56.1 ¶ 43.)  Leftridge claims that administrators, like Bailey, observe teachers early in the year to "retaliate and control" them.  (Pl.'s 56.1 ¶ 43.)  In mid-October 2015, a DOE peer evaluator, Patricia Hanley, observed Leftridge's classroom and noted that he was uneven in responding to student misbehavior.  (Pl.'s 56.1 ¶ 44.)  On November 17, 2015, Bailey observed Leftridge again and noted that he did little to wake a sleeping student, and students commented Leftridge was re-teaching the same lesson from earlier in the day and using a worksheet in class that was meant to be homework.  (Pl.'s 56.1 ¶ 45.)

On November 20, 2015, Leftridge tripped in the classroom and was transported via emergency medical services to Kings County Hospital.  (Pl.'s 56.1 ¶¶ 46–47.)  Leftridge did not return to work until February 2017.  (Pl's 56.1 ¶ 48.)  While on leave, he used a combination of line of duty injury ("LODI") leave, FMLA leave, time from his leave balance, and restoration of health leave.  (Pl.'s 56.1 ¶ 49.)  The DOE only granted Leftridge LODI leave from November 20 through December 21, 2015.  (Pl.'s 56.1 ¶ 58.)  In 2016, Leftridge challenged that determination.  (Pl.'s 56.1 ¶ 59.)  DOE offered to settle by paying LODI benefits to Leftridge through April 2016.  (Pl.'s 56.1 ¶ 60.)  Leftridge declined that offer and a medical arbitration was scheduled for the autumn of 2018.  (Pl.'s 56.1 ¶ 61.)  Ultimately, Leftridge failed to appear for that arbitration.  (Pl.'s 56.1 ¶ 62.)

Leftridge also applied for disability benefits from his union, the United Federation of Teachers Welfare Fund ("UFT").  (Pl.'s 56.1 ¶ 63.)  In August 2016, Leftridge met with

---

[2]     Leftridge applied for a transfer to another school in May 2015 but the DOE denied his request.  (Pl.'s 56.1 ¶¶ 66–67.)

Philip, and when she declined to sign the UFT paperwork, he filed a grievance. (Pl.'s 56.1 ¶¶ 64–65.) In October 2016, Philip signed the paperwork, thereby mooting the issue. (Pl.'s 56.1 ¶ 65.)

IV.    <u>Leftridge I Settles</u>

Meanwhile, in April 2016, Leftridge, the DOE, and Philip settled <u>Leftridge I</u>. (Pl.'s 56.1 ¶ 24; <u>Leftridge I</u>, ECF No. 37.) The Agreement of Settlement and Dismissal ("Settlement Agreement") included a Stipulation of Dismissal with Prejudice and a General Release and Waiver ("General Release"). (Mildner Decl., Ex. E.) The City of New York (the "City"), among other things, agreed to pay Leftridge $5,000. (Settlement Agreement, at 2, 10.)[3] In the General Release, Leftridge waived and released the DOE, Philip, and:

> all past and present officials, employees, representatives, trustees and agents of the City of New York and DOE . . . (collectively, "Released Parties"), from any and all claims, liabilities or causes of action which were or could have been asserted by [Leftridge] against any of the Released Parties based upon anything that has happened up to now and including the date of the execution of this General Release, including, but not limited to (i) any and all liability, claims or rights of action which were or could have been alleged by [Leftridge] in the above-referenced action arising out of these events alleged in the complaint in this action, including, but not limited to, all claims for attorneys' fees and costs; and (ii) any and all other liability, claims or rights of action that may exist or arise up to any including the date that this General Release is signed, with the exception of the two potential claims specified immediately below.

(Settlement Agreement, at 10.) The "two potential claims" excluded from the release claims pending before the New York State Public Employment Relations Board (Case No. U-34579) and any notices of claim filed with the Comptroller of the City of New York as of March 2, 2016 (except Claim No. 2015PI005589). (Settlement Agreement, at 10.)

Additionally, in accord with the Older Workers Benefit Protection Act ("OWBPA"), 29 U.S.C. § 626, Leftridge acknowledged that:

---

[3]    The pagination in the Settlement Agreement refers to the respective numbers on ECF.

(i) he has carefully read this [Settlement] Agreement and associated documents, including the General Release, and that he enters this [Settlement] Agreement voluntarily and with full understanding and knowledge of its consequences; (ii) he has been advised to consult with an attorney before executing this [Settlement] Agreement and has done so; (iii) the payment and action described constitutes good and valuable consideration and is in addition to anything of value to which he was already entitled had he not signed this settlement agreement; (iv) he has been provided with at least a twenty-one (21) day period to review and consider whether to sign this [Settlement] Agreement; and (v) he has been advised that he has seven (7) days following his execution to revoke it (the "Revocation Period").

(Settlement Agreement, at 4.) Leftridge executed the Settlement Agreement on March 30, 2016 and an Assistant Corporation Counsel signed on behalf of the City on April 1, 2016. (Settlement Agreement, at 5.)

V.      § 3020-a Hearings, Article 75 Appeal, and Termination

        In February 2017, Leftridge returned to P.S. 93. (Pl.'s 56.1 ¶ 48.) One month later, the DOE filed charges against him for "incompetence and insufficient service, neglect of duty, misconduct and unwillingness and/or inability to follow procedures and carry out normal duties during the 2014-2015, 2015-2016, and 2016-2017 school years." (Pl.'s 56.1 ¶ 51; Mildner Decl., Ex. M ("§ 3020-a Opinion and Award"), at 1.) After the DOE filed charges, Leftridge was reassigned from a classroom to the front office at P.S. 93. (Pl.'s 56.1 ¶ 52.)

        A hearing ensued spanning five days before a neutral hearing officer in which both the DOE and Leftridge were represented by counsel, afforded an opportunity to adduce evidence, examine and cross-examine witnesses, and to make their respective arguments. (Pl.'s 56.1 ¶ 53; § 3020-a Opinion and Award, at 1–2.) At issue were two sets of "Specifications": (1) Leftridge's failure to "properly, adequately and/or effectively plan and/or execute lessons" based on eight observations of Leftridge's classroom from October 31, 2014 through November 17, 2015; and (2) his failure to "fully and/or consistently implement directives and/or recommendations for pedagogical improvement and professional development" provided to him

regarding, <u>inter alia</u>, lesson planning, teaching methodology, and student engagement. (§ 3020-a Opinion and Award, at 2.)

In responding to the DOE's charges, Leftridge argued that his reassignment to teach a fifth-grade class in the 2014-15 school year, coupled with his family circumstances and diagnoses for depression and anxiety, should be considered when making any employment determination. (§ 3020-a Opinion and Award, at 6.) He noted that he was open to rehabilitation and was attempting to improve his performance. (§ 3020-a Opinion and Award, at 6–7.) The DOE countered that during the eight observations, Leftridge was frequently unprepared and his lessons were incoherent. (§ 3020-a Opinion and Award, at 8.) The DOE also argued that Leftridge received explicit advice after each observation but failed to implement it. (§ 3020-a Opinion and Award, at 9.)

On August 6, 2017, Hearing Officer Michael A. Lendino sustained the charges against Leftridge, finding that there was credible evidence supporting each Specification, including Leftridge's failure to prepare for and execute lesson plans and failure to implement pedagogical recommendations. (Pl.'s 56.1 ¶ 54; § 3020-a Opinion and Award, at 40–43.) Hearing Officer Lendino determined that termination of employment was the appropriate penalty. (Pl.'s 56.1 ¶ 55; § 3020-a Opinion and Award, at 44.) Moreover, Hearing Officer Lendino addressed Leftridge's allegations of discrimination and found the evidence to be insufficient to support any claim of gender or disability discrimination. (§ 3020-a Opinion and Award, at 32–35.)

Leftridge filed an Article 75 proceeding in the Supreme Court of the State of New York to review Hearing Officer Lendino's determination. (Pl.'s 56.1 ¶ 57; Mildner Decl., Ex. R ("Article 75 Order"), at D002900.) On July 18, 2018, the Honorable Arlene P. Bluth dismissed

Leftridge's petition, finding that there was no evidence to upset the termination decision "given the substantial documentation demonstrating petitioner's inability to manage a classroom." (Pl.'s 56.1 ¶ 57; Article 75 Order, at D002905–06.)

DISCUSSION

I.    <u>Legal Standard</u>

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." <u>Baez v. JetBlue Airways Corp.</u>, 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted). This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.</u>, 444 F.3d 158, 162 (2d Cir. 2006) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ." <u>Rodriguez v. City of New York</u>, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 250 (citation and quotation marks omitted); <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable

8

inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

In addition, "when [a] plaintiff proceeds pro se, as in this case, a court is obliged to construe his [papers] liberally." McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004); Haines v. Kerner, 404 U.S. 519, 520 (1972). Therefore, this Court affords Leftridge "special solicitude" by interpreting his brief "to raise the strongest [arguments] that it suggests." Hardaway v. Hartford Pub. Works Dep't, 879 F.3d 486, 489 (2d Cir. 2018); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988) ("[S]pecial solicitude should be afforded pro se litigants generally, when confronted with motions for summary judgment."). But a pro se litigant's "'bald assertion, completely unsupported by evidence' is not sufficient to overcome a motion for summary judgment." D'Attore v. City of New York, 2013 WL 1180395, at *3 (S.D.N.Y. March 15, 2013) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).

II.     Leftridge I and the Settlement Agreement

As a preliminary matter, Defendants assert that any claims originating on or before April 1, 2016 are barred by the terms of the Settlement Agreement and its General Release. Leftridge side-steps this argument by noting that certain claims arose after April 1, 2016. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., ECF No 87 ("Pl.'s Opp'n"), at 4.)

"A settlement agreement is a contract that is interpreted according to general principles of contract law." Powell v. Omnicom, 497 F.3d 124, 128 (2d Cir. 2007). "The threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000). The meaning of an unambiguous contract "is a question of law for the court to decide." Revson, 221 F.3d at 66

(citing K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir. 1996)).

Additionally, "[u]der New York law, a release that is clear and unambiguous on its face and

which is knowingly and voluntarily entered into will be enforced." Pampillonia v. RJR Nabisco,

Inc., 138 F.3d 459, 463 (2d Cir. 1998).

An employee may waive federal and state discrimination and retaliation claims if

such a waiver is both knowing and voluntary. See Bormann v. AT & T Commc'ns, Inc., 875

F.2d 399, 400–03 (2d Cir. 1989); Hsueh v. Bank of N.Y., 2006 WL 2778858, at *3 (S.D.N.Y.

Sept. 26, 2006) (collecting cases applying "knowing and voluntarily" standard to federal claims

of discrimination under Title VII, the ADA, and related New York State claims). Courts must

employ a "totality of the circumstances" test to determine whether a release of these claims is

"knowing and voluntary." Livingston v. Adirondack Beverage Co., 141 F.3d 434, 438 (2d Cir.

1998); Nicholas v. NYNEX, Inc., 929 F. Supp. 727, 730 n.1 (S.D.N.Y. 1996).

The "totality of the circumstances" are determined by analyzing the following

factors: "1) the plaintiff's education and business experience, 2) the amount of time the plaintiff

had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding

the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was

represented by or consulted with an attorney, and 6) whether the consideration given in exchange

for the waiver exceeds employee benefits to which the employee was already entitled by contract

or law." Bormann, 875 F.2d at 403 (quoting EEOC v. Am. Express Publ'g Corp., 681 F. Supp.

216, 219 (S.D.N.Y. 1988)). Additionally, courts consider "whether an employer encourages or

discourages an employee to consult an attorney . . . and whether the employee had a fair

opportunity to do so." Bormann, 875 F.2d at 403 (citation omitted). "These factors are not

exhaustive, nor must all of the factors be satisfied before a release is enforceable." Nicholas, 929

F. Supp. at 730.

Here, the General Release unambiguously waives "any and all claims, liabilities or causes of action which were or could have been asserted by [Leftridge] against any of the Released Parties based upon anything that has happened up to now and including the date of the execution of this General Release."  (Settlement Agreement, at 10.)  The Settlement Agreement contains parallel language to release the parties from "all claims, liabilities and/or causes of action . . . based upon anything that has happened up to now and including the date of the execution of this Agreement."  (Settlement Agreement, at 3.)  While Bailey was not a Defendant in Leftridge I, the contract clearly includes all employees of the City and DOE.  Leftridge signed the Settlement Agreement and General Release on March 30, 2016 and the Assistant Corporation Counsel signed the Settlement Agreement on April 1, 2016.  (Settlement Agreement, at 5, 11.)  Thus, the plain terms of the Settlement Agreement and General Release in Leftridge I effectively waive all claims against each of the Defendants in this action on or before April 1, 2016.[4]

Nonetheless, this Court must analyze the "totality of the circumstances" to determine if Leftridge's release was "knowing and voluntary."  First, Defendants correctly point to evidence of Leftridge's education and business experience, including bachelor's and master's degrees, credits toward a second master's degree, and work as a schoolteacher for over ten years. (Mildner Decl., Ex. A., at 167–69.)  These credentials buttress a determination that his waiver was "knowing and voluntary."  See, e.g., United States v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 365, 414 (S.D.N.Y. 2018) (plaintiff with bachelor's degree and seven years employment for the DOE as a teacher and assistant principal supported the proposition that he knowingly and

---

[4]     The contract incorporates language from the OWBPA, which applies to ADEA claims.  See Tung v. Texaco Inc., 150 F.3d 206, 208 (2d Cir. 1998) (per curiam).  While Leftridge is not pursuing ADEA claims in this action, there is no indication the plain terms of this requirement were not met.

voluntarily released claims); <u>Bachiller v. Turn On Products, Inc.</u>, 2003 WL 1878416, at \*4 (S.D.N.Y. April 14, 2003) (finding plaintiff with high school equivalency diploma, and who served as accounts payable clerk before termination of employment, knowingly and voluntarily released claims), <u>aff'd</u>, 86 F. App'x 465 (2d Cir. 2004).

Second, Leftridge had 21 days to review the Settlement Agreement and General Release and seven days after execution to revoke the contract. (Settlement Agreement, at 4, 11.) These time intervals are well within the standard deemed sufficient. <u>See, e.g.</u>, <u>Mandavia v. Columbia Univ.</u>, 2013 WL 2391695, at \*7 (S.D.N.Y. June 3, 2013) ("Plaintiff's sporadic opportunities to review the terms of the Agreement during the two-week negotiation period, and the several hours afforded to him the day that he signed, are sufficient for the second <u>Bormann</u> factor to weigh in favor of the Agreement's validity."), <u>aff'd</u>, 556 F. App'x 56 (2d Cir. 2014); <u>Cordoba v. Beau Dietl & Assocs.</u>, 2003 WL 22902266, at \*5 (S.D.N.Y. Dec. 8, 2003) (finding four days to sign a release sufficient for plaintiff to "acquaint herself with the [r]elease's terms and make a considered decision"); <u>Laramee v. Jewish Guild for the Blind</u>, 72 F. Supp. 2d 357, 360 (S.D.N.Y. 1999) (deeming sufficient "slightly less than one month" to review a release).

Third, Defendants note that Leftridge participated in formulating the terms of the Settlement Agreement because he excluded from the General Release his claims pending before the New York State Public Employment Relations Board and the claims alleged in his notice of claim filed with the Comptroller of the City of New York as of March 2, 2016 (except Claim No. 2015PI005589). (Settlement Agreement, at 3, 10.) Again, this factor weighs in favor of upholding the release. <u>See, e.g.</u>, <u>Mandavia</u>, 2013 WL 2391695, at \*8 (finding an individual negotiating employee salary and benefits, through his union representative, made waiver knowingly and voluntarily). Moreover, even if Leftridge's role was not significant in bargaining

for the terms of the release, "the absence of this factor alone does not create an issue of fact as to voluntariness." Laramee, 72 F. Supp. 2d at 360; Bormann, 875 F.2d at 403 n.1.

Fourth, this Court concludes that the language in the Settlement Agreement and General Release is "clear and unambiguous." Matusovsky v. Merrill Lynch, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). The documents were written in plain English and cover "any and all claims, liabilities or causes of action . . . based upon anything that has happened up to" the date of the execution of the contract. (Settlement Agreement, at 10.) This factor is indicative of a valid waiver. See, e.g., Matusovsky, 186 F. Supp. 2d at 400 (finding that general release "written in plain English" and that covered "anything which has happened up to now" was sufficiently clear); Laramee, 72 F. Supp. 2d at 360 (upholding validity of release that was three pages, written in plain English, and waived plaintiff's right to bring any action against employer related to the conditions or termination of her employment).

Fifth, Leftridge appeared pro se in his prior action. (Settlement Agreement, at 5.) While this would normally weigh against a knowing and voluntary waiver, the Settlement Agreement states that Leftridge "has been advised to consult with an attorney before executing this Agreement and has done so." (Settlement Agreement, at 4.) "Courts in this district have held that a release's encouragement to consult with an attorney weighs in favor of the agreement's enforceability." Kramer v. Vendome Grp. LLC, 2012 WL 4841310, at *4 (S.D.N.Y. Oct. 4, 2012); see also Matusovsky, 186 F. Supp. 2d at 400 ("Although [plaintiff] was not represented by an attorney, he had fair opportunity to obtain one prior to commencing [his civil] action or during its pendency."). Given the fact that Leftridge was encouraged to consult an attorney and had a fair opportunity to do so, the fifth factor is neutral.

Sixth, Leftridge received consideration in exchange for his waiver that exceeded any benefits he would have received absent his signature, namely, $5,000. (Settlement Agreement, at 2.) This factor weighs in favor of finding that the release was knowing and voluntary. See, e.g., Laramee, 72 F. Supp. 2d at 361 (finding that "plaintiff received greater compensation than she would have been entitled to had she not signed the release"); Nicholas, 929 F. Supp. at 731–32 (same).

After analyzing the "totality of the circumstances," this Court finds that Leftridge's waiver was knowing and voluntary. Thus, Leftridge's release bars any federal claims to the extent they arose prior to April 2, 2016. This includes any claims related to his first § 3020-a hearing in 2014, his claims regarding the assignment of particular students to his classroom during the 2014-15 school year, his ineffective rating for the 2014-15 school year, the DOE's denial of his request to switch schools in May 2015, his complaints concerning reasonable accommodations at P.S. 93 in 2015, and his claims regarding the denial of paid leave from December 2015 through April 1, 2016.

New York State courts enforce "a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into . . . as a private agreement between the parties." Skluth v. United Merchs. & Mfrs., Inc., 559 N.Y.S.2d 280, 282 (App. Div. 1990) (quotation marks omitted). While releases under New York law do not require consideration, N.Y. Gen. Oblig. § 15–303, they may be attacked "for being the product of fraud, duress or undue influence." Skluth, 559 N.Y.S.2d at 282; Matusovsky, 186 F. Supp. 2d at 401. Since the "totality of the circumstances" standard is stricter than ordinary New York State contract principles, if a plaintiff "has waived her federal claims, she has also waived her New York State law claims." Laramee, 72 F. Supp. 2d at 359. Here, Leftridge does not claim that the

Settlement Agreement was procured through fraud, duress, or undue influence. Therefore, because Leftridge's waiver was knowing and voluntary as to his federal claims, it also bars New York State and City law claims prior to April 2, 2016. See, e.g., Nicholas, 929 F. Supp. at 733 (dismissing state law employment discrimination claims after finding plaintiff signed release knowingly and voluntarily under stricter federal standard); see also Bachiller, 2003 WL 1878416, at *4 ("Accordingly, since Plaintiff has waived her federal claims, she has also waived her claims under New York State and New York City Human Rights Law.").

III.    Collateral Estoppel

Defendants next move for summary judgment on the grounds that Leftridge's post-April 1, 2016 claims are precluded by the doctrine of collateral estoppel. Specifically, Defendants argue that Leftridge had an opportunity to fully and fairly litigate the same issues presented here during Leftridge's § 3020-a proceedings before the hearing officer. The doctrine of collateral estoppel precludes re-litigation of an issue when: "(1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." Grieve v. Tamerin, 269 F.3d 149, 153 (2d Cir. 2001) (alteration in original) (quotation marks omitted).

"Under New York law, collateral estoppel 'precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the tribunals or causes of action are the same.'" LaFleur v. Whitman, 300 F.3d 256, 271 (2d Cir. 2002) (alteration in original) (quoting Ryan v. N.Y. Tel. Co., 467 N.E.2d 487, 490 (N.Y. 1984)). Moreover, the Second Circuit has held that a § 3020-a hearing is a "quasi-judicial administrative action whose findings are entitled to

preclusive effect." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 308 (2d Cir. 2005); Smith v. N.Y.C. Dep't of Educ., 808 F. Supp. 2d 569, 578 (S.D.N.Y. 2011). "Section 3020-a decisions are not generic or interchangeable—they vary in their determinations of fact and law and, therefore, in their preclusive effect." Denicolo v. Bd. of Educ. of City of N.Y., 328 F. Supp. 3d 204, 211 (S.D.N.Y. 2018). Accordingly, this Court must analyze the specific facts and circumstances of the § 3020-a hearing to determine whether Leftridge's remaining claims are precluded.

IV.    Discrimination Claims

Leftridge claims that Defendants discriminated against him on the basis of gender in violation of Title VII. Leftridge also asserts that Defendants discriminated against him on the basis of his disability in violation of the ADA and the Rehabilitation Act. He brings related causes of action under the NYSHRL and NYCHRL. To the extent Leftridge claims that he was subject to an adverse employment action—termination on the basis of gender and disability—because of the § 3020-a charges brought against him in 2017, those claims are collaterally estopped by the § 3020-a hearing and Justice Bluth's Article 75 review of those findings.[5]

First, the issues raised in Leftridge's § 3020-a hearing are identical to those before this Court. Hearing Officer Lendino determined that Leftridge was an incompetent teacher. And the two Specifications tried before him—related to Leftridge's failure to prepare for and execute lesson plans and failure to implement pedagogical recommendations—are the same factual

---

[5]    While Leftridge did not check the box in his "Statement of Claim" that Defendants failed to accommodate his disability, he did request that Defendants reasonably accommodate his disability in the "Relief" section of the Complaint. (ECF No. 2. ("Compl."), at 5–6.) However, since his reasonable accommodation claims appear to stem from the repair of the SMART board and his requests to be transferred to another school, these claims are barred by his prior waiver. Additionally, Leftridge is precluded from challenging Hearing Officer Lendino's factual findings related to this issue and does not make any arguments to the contrary in his briefs. Therefore, to the extent Leftridge brings failure to accommodate claims under the ADA, Rehabilitation Act, NYSHRL, and NYCHRL, Defendants' motion for summary judgment is granted and these claims are dismissed.

issues raised here. But Leftridge claimed that he was subjected to employment discrimination. Thus, "in both contexts, it becomes necessary to resolve whether [Leftridge] was subjected to adverse employment actions because of his own conduct or because of other factors, such as impermissible discrimination by [D]efendants." Smith, 808 F. Supp. 2d at 580; see also Mohammed v. N.Y.C. Dep't of Educ., 932 F. Supp. 2d 420, 428 (E.D.N.Y. 2013) ("Whether Plaintiff was terminated because of valid performance concerns or impermissible considerations is dispositive of Plaintiff's discrimination claims, and that same issue was raised in the Section 3020–a hearing.").

Second, Leftridge argues that Hearing Officer Lendino did not address his allegations of discrimination and retaliation. Additionally, he notes that the "timing of the [New York State Division of Human Rights ("SDHR")] charge in January 2017, followed by [§] 3020-a charges in April 2017, clearly suggest a retaliatory motive for these charges orchestrated by Principal Philip against [him]." (Pl.'s Opp'n, at 5–6.) Leftridge relies on Leon v. N.Y.C. Dep't of Educ., a summary order holding that the district court erroneously concluded that a § 3020-a hearing determination precluded a federal claim. 612 F. App'x 632, 634 (2d Cir. 2015) (summary order). There, the Second Circuit found "no indication that the Section 3020–a hearing addressed, much less 'actually decided,' whether the charges leading to [plaintiff's] termination were driven, even in part, by discriminatory or retaliatory intent." Leon, 612 F. App'x at 634–35. The district court's error "stem[med] from the faulty assumption that termination for cause necessarily precludes the possibility of termination motivated by unlawful animus." Leon, 612 F. App'x at 635. Although the hearing officer found the plaintiff had engaged in the charged conduct, this would "not preclude a jury from later finding that [the plaintiff] was also terminated at least in part because of [discriminatory reasons]." Leon, 612 F.

App'x at 635 (alterations in original) (quoting Matusick v. Erie Cty. Water Auth., 757 F.3d 31, 47 (2d Cir. 2014)).

As to the discrimination allegations, Hearing Officer Lendino explicitly rejected these claims. More than three pages of his opinion were dedicated to Leftridge's "Allegation of Discrimination." (§ 3020-a Opinion and Award, at 32–35.) Hearing Officer Lendino analyzed Leftridge's claims of discrimination, noting that Leftridge was confused as to both the dates of his allegations and the substance of his claims—i.e., whether his claims were for gender or disability discrimination. He determined that Leftridge's statements concerning discrimination "are accusations without supportive evidence" and he "did not find any evidence to conclude that there was discrimination against [Leftridge] by the school administrators." (§ 3020-a Opinion and Award, at 35.) Because Hearing Officer Lendino made these findings and rejected Leftridge's accusations, this Court concludes that the parties actually litigated Leftridge's discrimination claims. Hearing Officer Lendino decided that any adverse employment action was justified and not based on impermissible discrimination. See Smith, 808 F. Supp. 2d at 580 ("[B]ecause the hearing officers concluded that there existed just cause for the adverse employment actions, those officers actually decided that [plaintiff] cannot make out a prima facie case of discrimination nor can he put forth evidence of pretext.").

However, this Court finds that Leftridge's retaliation claims are not barred by collateral estoppel. Hearing Officer Lendino addressed Leftridge's SDHR charge, but only to the extent of concluding that Leftridge frequently filed charges against his administrators. Since Hearing Officer Lendino never explicitly ruled on the merits of Leftridge's retaliation claim, this issue was not decided at the § 3020-a hearing. See, e.g., Washington v. NYC Dep't of Educ., 2017 WL 4687982, at *8 (S.D.N.Y. Oct. 16, 2017) (finding collateral estoppel barred plaintiff's

discrimination claims but not her retaliation claims because retaliation claims were not expressly decided at the § 3020-a hearing), aff'd sub nom. Washington v. New York City Dep't of Educ., 740 F. App'x 730 (2d Cir. 2018); see also Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 471 (S.D.N.Y. 2011) ("Thus, because Plaintiff's retaliation claim was expressly not decided at the hearing, he is not estopped from pursuing that claim now."). The same holds true for Leftridge's hostile work environment and FMLA claims.

There is little doubt that Leftridge had a full and fair opportunity to litigate in the § 3020-a proceedings. Leftridge was represented by counsel in his pre-hearing conference and during the five days of substantive hearings. The hearings involved the examination and cross-examination of sworn witnesses and the introduction of evidence. An official stenographic record of the proceedings was made, and the final opinion spanned over 40 pages. Leftridge asserts that the DOE hand-picked Hearing Office Lendino for the proceeding and he was "pro NYC DOE." (Compl., at 5; Pl.'s 56.1 ¶ 55.) But these assertions are unsupported by any evidence and belied by the record. Leftridge appealed his termination under Article 75. And after reviewing the record, Justice Bluth—a neutral arbiter unconnected to any DOE administrative proceedings—found no basis to overturn Hearing Officer Lendino's factual findings or ultimate determination.

Finally, "it is clear that the findings of [Hearing Officer Lendino] regarding the propriety of the adverse employment action were not only necessary to support a valid and final judgment on the merits, but that those find[ings] were the key conclusions reached at the hearings." Smith, 808 F. Supp. 2d at 581. And these findings were subsequently upheld in the Article 75 appeal. Therefore, Leftridge's claims for discrimination under Title VII, the ADA, the Rehabilitation Act, and the NYSHRL are barred by the doctrine of collateral estoppel.

V.    Retaliation Claims

Leftridge contends that Defendants retaliated against him for his discrimination complaints—namely, the filing of Leftridge I and his SDHR grievance.  Claims of retaliation under Title VII, the ADA, the Rehabilitation Act, and the NYSHRL are governed by the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U. S. 792 (1973).  See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013) (Title VII and NYSHRL); Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) ("Claims for retaliation [under the ADA and Rehabilitation Act] are analyzed under the same burden-shifting framework established for Title VII cases.").  To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the [employer] knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Littlejohn v. City of New York, 795 F.3d 297, 315–16 (2d Cir. 2015) (quoting Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010)).  "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'"  Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

At the second step, "[o]nce the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  Zann Kwan, 737 F.3d at 845.  "If the defendant provides such an explanation, 'the presumption of retaliation dissipates.'"  Ya-Chen Chen v. City Univ. of N.Y.,

805 F.3d 59, 70 (2d Cir. 2015) (quoting <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173

(2d Cir. 2005)).  Finally, at the third step, "[t]he plaintiff must then come forward with [proof

that the] non-retaliatory reason is a mere pretext for retaliation."  <u>Zann Kwan</u>, 737 F.3d at 845.

To satisfy this burden, the plaintiff "must show that retaliation was a 'but-for' cause of the

adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision."

<u>Zann Kwan</u>, 737 F.3d at 845–46 (citing <u>Univ. of Tex. Sw. Med. Ctr. v. Nassar</u>, 133 S. Ct. 2517,

2526, 2533 (2013)).  "'But-for' causation does not, however, require proof that retaliation was

the only cause of the employer's action—it is enough that the adverse action would not have

occurred in the absence of the retaliatory motive."  <u>Nieblas-Love v. N.Y.C. Hous. Auth.</u>, 165 F.

Supp. 3d 51, 70 (S.D.N.Y. 2016) (citing <u>Nassar</u>, 133 S. Ct. at 2533).

   First, the filing of <u>Leftridge I</u> and the SDHR grievance are both protected

activities.  <u>See</u> <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990) (stating that a

"protected activity" for retaliation purposes includes both formal litigation and "informal protests

of discriminatory employment practices"); <u>Zoulas v. N.Y.C. Dep't of Educ.</u>, 400 F. Supp. 3d 25,

57 (S.D.N.Y. 2019) (finding filing of complaint with SDHR to be protected activity).  Second,

Defendants note that they were aware of these claims as of July 2015.  (Defs.' Mem. of Law in

Supp. of their Mot. for Summ. J., ECF No. 76 ("Defs.' Mem. of Law"), at 21.)  Third, Leftridge

was terminated from DOE employment in August 2017, which constitutes an adverse

employment action.[6]  <u>See</u> <u>Morrison v. Potter</u>, 363 F. Supp. 2d 586, 590 (S.D.N.Y. 2005)

---

[6] Leftridge apparently argues that Philip retaliated against him by refusing to sign paperwork that would allow him to receive a monetary stipend from UFT.  This is neither an "adverse employment action" nor a material issue in dispute because Leftridge acknowledged that Philip ultimately signed the paperwork and the issue was mooted.  (Pl.'s 56.1 ¶ 65.)

("Classic examples of 'adverse employment action' include termination of employment or demotion.").

However, Leftridge cannot satisfy the fourth element of his prima facie case. Leftridge relies on temporal proximity to support an inference of retaliation because he filed his SDHR grievance in January 2017 and received his disciplinary charges in March 2017. See Littlejohn, 795 F.3d at 319 (a plaintiff may rely on temporal proximity between the protected activity and adverse action to establish causation at the prima facie stage). However, Leftridge was not terminated until August 2017, after the § 3020-a hearings. See Nadel v. Shinseki, 57 F. Supp. 3d 288, 299 (S.D.N.Y. 2014) ("[C]ourts in this Circuit have often found that a temporal gap of approximately three months between the protected activity and the adverse action, without more, prohibits an inference of causation."). While the § 3020-a hearings did not make findings explicitly related to retaliation, the factual findings that form the basis of the charges brought against Leftridge are entitled to preclusive effect. See Burkybile, 411 F.3d at 312. And these findings stemmed from multiple charges of incompetence that preceded both Leftridge I and his SDHR complaint. Defendants note correctly that where, as here, an employer is considering adverse employment actions before the protected activity occurred, "[the employer] proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001).[7]  For these

---

[7]      Even assuming arguendo that Leftridge establishes his prima facie case, Defendants have carried their burden in demonstrating legitimate, non-retaliatory reasons for the DOE's termination of Leftridge—i.e., his incompetence as a teacher.  And Leftridge has failed to produce evidence sufficient to permit a rational factfinder to conclude Defendants' reasons constituted pretext for impermissible retaliation.  Although the Second Circuit has not yet decided whether the "but-for" causation standard applies to NYSHRL claims, see, e.g., Holcomb v. State Univ. of N.Y. at Fredonia, 698 F. App'x 30, 31 (2d Cir. 2017), this Court need not address the proper standard here because it finds that no reasonable jury could conclude that Defendants were "motivated by prohibited retaliation," Gordon, 232 F.3d at 116 (quotation marks and alterations omitted), let alone that retaliation was a "but-for" cause of the decision to terminate Leftridge.

reasons, Leftridge's Title VII, ADA, Rehabilitation Act, and NYSHRL retaliation claims are dismissed.

VI.     Hostile Work Environment Claims

        The standard for demonstrating a hostile work environment is the same under Title VII, the ADA, the Rehabilitation Act, and the NYSHRL.  Fox v. Costco Wholesale Corp., 918 F.3d 65, 73 (2d Cir. 2019) (ADA); Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (Title VII and the NYSHRL); Lucenti v. Potter, 432 F. Supp. 2d 347, 360 (S.D.N.Y. 2006) ("[H]ostile work environment and retaliation claims under Title VII and the Rehabilitation Act properly are addressed under the same standard.").  To defeat a motion for summary judgment, a plaintiff must show: "(1) that the harassment was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment,' and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  Fox, 918 F.3d at 74 (alteration in original) (quoting Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)).  The conduct must be both "objectively severe or pervasive . . . [to] a reasonable person," as well as "subjectively . . . hostile or abusive [to the plaintiff]."  Patane, 508 F.3d at 113 (quotation marks omitted).  "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic."  Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015).

        Here, Leftridge asserts that he was subject to a hostile work environment because Philip refused to remove certain students from his classroom.  Not only are these claims barred by Leftridge's waiver because they occurred prior to April 2, 2016, but no reasonable jury could conclude that Defendants created or maintained a hostile educational environment on the basis of Leftridge's gender or disability.  Leftridge's claims are unsupported by the record and are certainly not "objectively severe or pervasive . . . [to] a reasonable person."  Patane, 508 F.3d at

113 (quotation marks omitted). This is a far cry from situations in which a plaintiff brings a hostile work environment claim on the basis of pervasive student-on-teacher harassment. See, e.g., Berger-Rothberg v. City of New York, 803 F. Supp. 2d 155, 165 (E.D.N.Y. 2011) (denying summary judgment on hostile work environment claim where teacher adduced sufficient evidence showing she was subject to "constant, vicious name-calling, coupled with repeated acts and threats of violence, including at least one incident involving inappropriate sexual contact" without school officials taking appropriate remedial action). Therefore, Leftridge's Title VII, ADA, Rehabilitation Act, and NYSHRL hostile work environment claims are dismissed.

## VII.   FMLA Claim

Leftridge checked the box on his Complaint for an FMLA claim. (Compl., at 4.) Defendants argue that summary judgment should be granted on Leftridge's FMLA claim because Leftridge "has not alleged that he was denied FMLA leave, nor has he alleged that he was retaliated against for taking this type of leave." (Defs.' Mem. of Law, at 24.) This Court agrees with Defendants. Additionally, since Leftridge did not dispute Defendants' assertions in his opposition to their summary judgment motion, this Court deems Leftridge's FMLA claim to be abandoned. See Collins v. City of New York, 295 F. Supp. 3d 350, 361 (S.D.N.Y. 2018) ("Federal courts may deem a claim abandoned when a party opposing summary judgment fails to address the [movant's] argument in any way. Accordingly, the Court dismisses these claims as abandoned." (alteration in original) (quotation marks omitted)); Hayes v. County of Sullivan, 853 F. Supp. 2d 400, 418 (S.D.N.Y. 2012) (pro se plaintiff abandoned § 1983 claim where he did not address claim in either of his affidavits in response to defendants' motions for summary judgment); Smith v. N.Y.C Dep't of Educ., 2011 WL 5118797, at *6 n.8 (S.D.N.Y. Oct. 28, 2011) (concluding that pro se plaintiff abandoned federal and state law claims not addressed in

his opposition to summary judgment).  Therefore, Leftridge's FMLA claim is dismissed.

VIII.    NYCHRL Claims

This Court construes Leftridge's opposition brief to assert discrimination, retaliation, and hostile work environment claims under the NYCHRL.  The NYCHRL is "given an independent liberal construction," Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (quotation marks omitted), in light of the statute's "uniquely broad and remedial purposes," Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (quotation marks omitted).

A plaintiff alleging discrimination under the NYCHRL "need only demonstrate by a preponderance of the evidence that [he] has been treated less well than other employees because of [his gender]."  Mihalik, 715 F.3d at 110 (quoting Williams v. N.Y.C. Hous. Auth., 872 N.Y.S.2d 27, 39 (App. Div. 2009)); Gonzalez v. City of New York, 377 F. Supp. 3d 273, 301 (S.D.N.Y. 2019) (applying same standard to disability discrimination under the NYCHRL).  As recounted earlier, Leftridge's discrimination claims are precluded by the doctrine of collateral estoppel.  And "[t]he standard under the NYCHRL is liberal, but not boundless . . . ."  LeBlanc v. United Parcel Serv., 2014 WL 1407706, at *13 (S.D.N.Y. Apr. 11, 2014).

As for Leftridge's retaliation claim, the NYCHRL inquiry is "broader than its federal counterpart."  Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 723 (2d Cir. 2010) (quotation marks omitted).  But while the NYCHRL's lenity allows for a broader definition of retaliatory actions, it does not relieve a plaintiff of the burden to establish a prima facie case and create a triable issue of fact.  See Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789, 791 (App. Div. 2013).  In addition to the deficiencies in his prima facie case,

Leftridge introduces no evidence to show that Defendants' non-retaliatory reasons for the decisions at issue were pretextual.

Finally, for hostile work environment claims, while a plaintiff must show that the conduct "at issue created a work environment that is both objectively and subjectively hostile, [ ] the environment need not be unendurable or intolerable." Fenner v. News Corp., 2013 WL 6244156, at *13 (S.D.N.Y. Dec. 2, 2013) (quotation marks omitted). Under the "NYCHRL's simplified inquiry, the plaintiff need only show that her employer treated her less well than other similarly situated employees, at least in part for discriminatory reasons." Fenner, 2013 WL 6244156, at *13 (quotation marks omitted). "And unlike state law, New York City law permits an employer to be held vicariously liable for an employee's conduct if the employee is the plaintiff's supervisor." Marchuk v. Faruqi & Faruqi, LLP, 100 F. Supp. 3d 302, 308 (S.D.N.Y. 2015) (citing NYCHRL § 8–107(13)(b)(1)–(3)). Nonetheless, the glaring error in Leftridge's claim is that he fails to bring forward any evidence demonstrating that he was treated "less well" than other DOE employees at least in part because of his gender or disability. And, as mentioned above, Leftridge's allegations—such as Philip assigning allegedly misbehaving students to his classroom—are both barred by the April 1, 2016 release and do not establish a prima facie hostile work environment claim. While Leftridge is correct that the NYCHRL is a more liberal standard, it is not a "general civility code." Mihalik, 715 F.3d at 110 (quotation marks omitted). Accordingly, the NYCHRL claims against Defendants are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Opinion & Order would not be taken in good faith. See Coppedge v. United States, 369 U.S. 438, 444

(1962).  The Clerk of the Court is directed to terminate the motion pending at ECF No. 74 and to

mark this case as closed.

Dated: March 30, 2020
       New York, New York


                             SO ORDERED:


                             _____
                             WILLIAM H. PAULEY III
                                   U.S.D.J.